## Minor v. Southeastern Greene School District

*John A. Stets,* for plaintiff.
*R. Wallace Maxwell,* for defendant.

TOOTHMAN, *P.J.,* August 2, 1977 — A petition for an injunction against the Southeastern Greene School District to halt the construction of a consolidated elementary school building to house grades kindergarden (K) through six was filed by plaintiff, James Minor, a citizen and taxpayer in the district, on June 22, 1977. A temporary injunction was granted, and the issue set for a hearing on June 27, 1977, which was extended into three hearing ses-

sions, in order to accommodate the several witnesses who were called by both parties. Following the hearings, and continuing the temporary injunction, we directed the testimony to be transcribed and indicated that a final ruling thereon would be expeditiously entered, the court understanding both the urgency as well as the importance of the question enveloping the district.

Petitioner, acting in a role more significant than only as an individual taxpayer, he being also one of three directors who were nominated in this year's primary on both tickets, to take a seat on the board this December, and is also president of a newly formed citizens group whose principal stated purpose is their adamant opposition to the construction of a new consolidated elementary school. The petition charges the board with acting in a reckless, arbitrary and capricious manner in that it, at its June 15, 1977, meeting, announced its intention to proceed with site selection and purchase and to employ an architectural firm to prepare the plans and to arrange for the necessary approvals from the several State agencies to commence construction. The board had earlier, on February 16, 1977, at a regularly scheduled meeting voted seven to two in favor of the project, but had done nothing further until the June meeting. What delayed the board's action until the June meeting following the May 17th election is not apparent from either the contents of the petition or any testimony submitted at the hearing. In further support of its contention that the board is, or will be, acting arbitrarily and capriciously, petitioner cites these reasons:

(1) That the three newly nominated board members ran on an anti-new-school platform, and all three were nominated on both tickets, practically

assuring their board membership on December 5, 1977.

(2) That with these three additions, together with the present two board members who voted negatively on the project, when the new board convenes in December of this year, the project, in whatever stage it is then found, will be axed.

(3) That in the meantime, the present board will have spent considerable money on a school site, and will also have committed the district to an architect's fee, in a percentage amount of the total construction costs; irregardless of whether construction is completed.

(4) And in committing the district to these expenditures, there will still be the unattended repairs on the Glassworks, Penn Pitt and Bobtown elementary schools to remove the Department of Labor and Industry citations, with especially critical work still required on the junior high section of the high school.

Countering these objections, the presently constituted board cites as reasonable and compelling reasons for it to be left free of any court restriction, pointing out these strongly logical considerations:

(1) That the board has had under study the construction of a consolidated elementary school for three years, and that it is, in their considered judgment, absolutely essential to provide a suitable, well-rounded educational program for the district.

(2) That it is imperative to commence this work quickly to avoid making extensive and expensive repairs to the three present neighborhood elementary schools, and thereby to protect the health and safety of the children.

(3) That irrespective of the primary election results, there is no guarantee that any money ex-

pended prior to the new board taking over will be wasted money, since ultimately the district will have to confront its difficult educational space and program requirements.

(4) That the board is not unduly accelerating its progress on these matters, since it voted at its February meeting to move ahead, and any actions it takes now will be in accord with established Department of Education requirements, which are called Plan-Con.

The case and the issues raised by it fit into the classic mold of the ever-increasing pressures brought to bear by the State in its demands for new schools and new programs upon the school district as opposed to the ever-increasing resistance of the taxpayer to accept those pressures and his increasing unwillingness to bear the resultant costs of those improvements. The Public School Code of January 14, 1970, P.L. (1969) 468, 24 P.S. §7-701, places directly upon the school board the responsibility for providing the necessary grounds and suitable buildings to house the educational facilities. The remainder of the act says very little about how and when this is to be done. However, the law recognizes this duty as a primary function of the board in the exercise of its inherent powers and prerogatives, rather than that of the court. In a recent case of this nature before us, that of Kelce Mosley et al. v. Central Greene School District, no. 640, in Equity, December, 1976, in our opinion refusing an injunction against the construction of a middle school, we stated, at page 4:

"It can be readily seen therefore, that the discretionary powers of the board are quite broad and the limitations upon the court to restrict or curtail those powers are very narrow and articulately

drawn. Such a condition arises from sound constitutional principles which have historically delegated and defined the separation of powers between and among the legislative, the executive and the judicial arms of government. The duty and authority, as it applies in this case, to provide the buildings and the educational program in each school is primarily vested in the board, and so long as they conduct those powers in compliance with the law, and without any arbitrary abuse of their discretion, no authority to veto or void the exercise of those purposes or programs acted upon by a majority vote of the board rests in the judiciary. For the court to have exceptionally broad or unlimited review powers, of school board action, which it does not, would ultimately lead to the elimination of the need for a school board."

In the case of Landerman v. Churchill Area School District, 414 Pa. 530, 534, 200 A. 2d 867 (1964), the Supreme Court stated:

"In order for a court of equity to grant relief, it must clearly be shown that the school board acted outside the scope of its statutory authority or not in good faith. 'It is only where the board transcends the limits of its legal discretion that it is amenable to the injunctive processes of a court of equity. . . '"

It is readily seen, therefore, that private citizens, in attempting to act through the court to limit or curtail the actions of a school board, carry a heavy burden: Regan v. Stoddard, 361 Pa. 469, 65 A. 2d 240 (1949). Arbitrary means "subject to individual will or judgment without restriction," according to Random House Dictionary, which defines capricious as being "subject to, led by, or indicative of, caprice or whim; erratic." We cannot easily attribute any of these characteristics to the earnest ef-

forts of the majority members of the school board, yet, we find this to be a circumstance which compels careful, deliberative, and cautious consideration on their part. Throughout the whole hearing, we were impressed anew with the conscientiousness of the members, as to the whole range of considerations, which are forced upon them: availability of money, the urgency of program change, the rising up keep and maintenance costs of present facilities versus the costs of new construction, the comparative transportation costs, assimilating and complying with the required procedures for new construction, evaluation of the present curriculum versus expanded curriculum, etc. And after such a project has been under consideration by the board for three years, with the accompanying opportunity and necessity for the members to weigh all the factors, it is a close line of demarcation as to when their action is one of sound discretion or one of caprice or whim.

Be that as it may, we do have a unique factual circumstance. By every reasonable sounding of majority public opinion, including the organized protest movement of the citizens, the resounding primary election results of three new incoming directors on both tickets, coupled with the fact that the board has until now delayed taking the concrete steps necessary for the construction of the consolidated elementary school in the district even though it has been much discussed, all of which now leaves the matter suspended in a perilous state. Admittedly, there is always some benefit from and reason for building a new building. And school board members are not alone in turning quickly to this alternative when space and program requirements start closing in on the district. That this is usually the prerogative of the public figure is not ques-

tioned in law, and, without a certain proclivity toward this, there could be no improvement in quartering the services of government. But to bow too quickly to the sometimes illusionary financial inducements and to become too hastily and unduly motivated by the professional persuasions which everywhere abound, that the board becomes the antagonist of its own constituency and thereby builds a building to provide more services than it is willing to accept or, even worse, is openly hostile toward, does not readily square, in our opinion, with reasoned and seasoned judgment.

In this case, threaded throughout the testimony, is a glimpse of what, in our mind, is the common pitfall of a public body contemplating a construction program. The first step is to hire an architect. Following that, although it is not the case here, the architect then goes over the citations of the State which it has leveled against existing facilities, and, for whatever reason, the estimates which follow generally run so high for the reasonable repair of those facilities and the immediate correction of the citations that the board is very naturally directed to a consideration of new construction as the practical alternative. While several witnesses alluded, in this case to the high cost of those estimates, there was little substantive evidence to support it. The board's customary next step is to execute a contract with an architect for the new construction, which, in standard form, requires the district to pay six percent of the cost of the new facility. Now, in all fairness, what architect, in normal circumstance, will not be induced to design and recommend the construction of the most expensive building, knowing that his fees will be fattened by any excesses in the design, rather than be compelled to pare the

structure down to bedrock in cost, size and design to fit basic needs of the district and the taxpayers capability to pay? While this need poses no problem in the private sector, it has seemed to us that professional contracts entered into by a public body for architectural services should be computed on a flat fee commensurate with the hours or work involved, with a bonus, if any, for holding the design and construction costs under a certain level, rather than allowing the opposite incentive to prevail. In this case, it was stated at the hearing, the architect offered his services for a four percent construction cost fee, based on supplying an off-the-shelf design, that is, one previously used for another district. We understand and applaud the attraction of the lesser percentage figure for professional services to the board, but we question whether, in a project estimated to be costing approximately $4,000,000, the school district is better served by having placed before it a reworked, warmed over set of plans, rather than to have had from the outset all the input of teachers, administrators, board members and even janitors in determining what the building should contain and have it planned from scratch in order to best serve the needs of the district. Furthermore, we doubt that the board can, or should, appoint an architect, whoever it might be and whatever his fees might be, to be its agent to provide for the completion of all the required steps of Plan-Con, which are the stages of development now carefully delineated by the State Educational Department. We are satisfied that there should be an agent who makes sure that the board gets fully and finally what it wants, rather than one who wants primarily to see that a building is built just for the sake of building.

As to the school site selection, we recognize that any precipitous action on the part of the board, even though possible, in the process is hardly likely, since that can, through the good offices of its solicitor, be protected against in the form of an option agreement, which becomes binding only upon its exercise. Yet in this situation, to do anything too quickly and to not take the ordinary or normal amount of time to inspect, to analyze and, finally, to conclude what place and for what price a site should be had, is fraught with the components of capriciousness and arbitrariness. Many school districts, particularly smaller ones such as this, ofttimes do not realize that a single commitment to a $4,000,000 indebtedness, on a single school construction project, automatically and irreversibly percludes many further choices in its educational options for the duration of the indebtedness, in this case for a period of 30 years, at least.

Viewing the whole of these matters in a light most favorable to the board, recognizing that after three years of planning, studying and discussing a new elementary school building, no definite action in the form of site purchase or architect employment has, as yet, been taken, and finding much now remaining to be done in order to comply with the tedious Plan-Con procedures, we are satisfied that sound judgment is not served by committing the district to a hastily conceived construction program. In addition, the district primary election shows strong majority opposition to the new building, and recognizing that vote as a prevalent sentiment in the district, it is, in our opinion, unwise to accelerate the construction plans for such a sizeable project with such a considerable monetary outlay, rather than to proceed with caution and delib-

eration to assure the district's best interests are served. Further, the district's superintendent who supports the project, has urged the board's considerable caution in the project, and against his caution, with the other difficulties apparent, for the board to proceed precipitiously would be evidence of an arbitrary and capricious handling of the matter such as merits judicial intervention. This conclusion flows from no intent on the part of the court to adjudicate the need or the lack of need for the central elementary school, either now or in the future. Any restraint on our part shall be only of a temporary nature, permitting the board still to continue its further navigational efforts through the preliminary phases of the murky Plan-Con waters, other than, until January 1, 1978, to restrain any contract with an architect or the purchase of a site. Irrespective of the presently avowed positions of the in-coming board members, it is to be recognized that they will have to make new evaluations and new judgments once they receive the mantle of board membership. It is to be expected that they will be as guided by a determination of what will serve the present and future educational well-being of the children in their districts as well as to correctly assess the present and future ability of the district to finance the costs incurred for that purpose.

## DECREE NISI

And now, August 2, 1977, the court orders the continuation of the temporary injunction, specifically and only enjoining the school board from the purchase of a consolidated elementary site, and from entering into a contract with any architect or architects for the construction of the same, and this

injunction to remain in effect until January 1, 1978, and forthwith, thereafter, dissolved. The costs of these proceedings to be paid by petitioner. This decree shall become final unless exceptions are taken thereto within 30 days from date.